1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   PATTI E. STEELE,                          No. 2:15-CV-1335-CMK

12              Plaintiff,

13        vs.                                   <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                Defendant.
16
     _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action under

19   42 U.S.C. § 405(g) for judicial review of a final decision of the Commissioner of Social Security.

20   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21   judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22   before the court are plaintiff's motion for summary judgment (Doc. 13) and defendant's cross-

23   motion for summary judgment (Doc. 17).

24   / / /

25   / / /

26   / / /

                                            1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on February 7, 2011.  In the application, plaintiff claimed that disability began on June 1, 2008, but amended the alleged onset date to December 10, 2010.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on March 13, 2013, before Administrative Law Judge ("ALJ") Dante M. Alegre.   In a May 15, 2013, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

    1.      The claimant has the following severe impairment(s): degenerative disc disease of the lumbar spine; status post discectomy on January 11, 2012; degenerative disc disease of the cervical spine; asthma; chronic obstructive pulmonary disease; dysthymia; and headaches;

    2.      The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

    3.      The claimant has the following residual functional capacity: she can perform light work; she can lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk six hours each in an eight-hour workday; occasionally climb, balance, stoop, kneel, crouch, or crawl; she can occasionally reach overhead with the right arm; the claimant must avoid exposure to fumes and odors; the claimant is limited to simple repetitive tasks and non-high production work;[1] and

    4.      The claimant is capable of performing past relevant work.

After the Appeals Council declined review on September 9, 2014, this appeal followed.

# II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

---

[1]     The ALJ's hearing decision contains the following sentence: "The claimant must avoid exposure to / sit about six hours in an eight hour workday; with unlimited pushing and pulling other / fumes and odors."  Clearly, this sentence is the result of some form of clerical error.  It is unclear, however, what restrictions, if any, on pushing and pulling apply to plaintiff.

1    (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

2    support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971).  The record as a whole,

3    including both the evidence that supports and detracts from the Commissioner's conclusion, must

4    be considered and weighed.  See <u>Howard v. Heckler</u>, 782 F.2d 1484, 1487 (9th Cir. 1986); <u>Jones</u>

5    <u>v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

6    decision simply by isolating a specific quantum of supporting evidence.  See <u>Hammock v.</u>

7    <u>Bowen</u>, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

8    findings, or if there is conflicting evidence supporting a particular finding, the finding of the

9    Commissioner is conclusive.  See <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

10   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

11   which supports the Commissioner's decision, the decision must be affirmed, see <u>Thomas v.</u>

12   <u>Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

13   standard was applied in weighing the evidence, see <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th

14   Cir. 1988).

15

16   **III.  DISCUSSION**

17         In her motion for summary judgment, plaintiff argues: (1) substantial evidence

18   does not support the ALJ's finding that plaintiff can perform past relevant work, either as

19   actually performed or as generally performed; (2) the ALJ erred by not obtaining a reasonable

20   explanation for a conflict between the vocational expert's testimony and the Dictionary of

21   Occupational Titles ("DOT") with respect to reasoning ability; (3) the ALJ erred in evaluating

22   the options of Drs. Tendall, Kinnison, Smith, and Keifer; and (4) the ALJ failed to provide

23   sufficient reasons for rejecting plaintiff's testimony and statements as not credible.

24   / / /

25   / / /

26   / / /

1     **A.**     <u>**Evaluation of Medical Opinions**</u>

2          The weight given to medical opinions depends in part on whether they are

3 proffered by treating, examining, or non-examining professionals. <u>See</u> <u>Lester v. Chater</u>, 81 F.3d

4 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating

5 professional, who has a greater opportunity to know and observe the patient as an individual,

6 than the opinion of a non-treating professional. <u>See id.</u>; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285

7 (9th Cir. 1996); <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given

8 to the opinion of a non-examining professional. <u>See</u> <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 & n.4

9 (9th Cir. 1990).

10          In addition to considering its source, to evaluate whether the Commissioner

11 properly rejected a medical opinion the court considers whether: (1) contradictory opinions are

12 in the record; and (2) clinical findings support the opinions. The Commissioner may reject an

13 uncontradicted opinion of a treating or examining medical professional only for "clear and

14 convincing" reasons supported by substantial evidence in the record. <u>See</u> <u>Lester</u>, 81 F.3d at 831.

15 While a treating professional's opinion generally is accorded superior weight, if it is contradicted

16 by an examining professional's opinion which is supported by different independent clinical

17 findings, the Commissioner may resolve the conflict. <u>See</u> <u>Andrews v. Shalala</u>, 53 F.3d 1035,

18 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be

19 rejected only for "specific and legitimate" reasons supported by substantial evidence. <u>See</u> <u>Lester</u>,

20 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of

21 the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

22 finding. <u>See</u> <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and

23 legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

24 professional. <u>See</u> <u>Lester</u>, 81 F.3d at 830-31. The opinion of a non-examining professional,

25 without other evidence, is insufficient to reject the opinion of a treating or examining

26 professional. <u>See</u> <u>id.</u> at 831. In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

        1.   Dr. Tendall

        As to Dr. Tendall, the ALJ stated:

> On October 18, 2008, John Tendall, M.D., reported that the claimant was examined at the request of the California Department of Social Services for an internal medicine evaluation.  The claimant complained of breathing problems, back and neck pain, and migraines.  Despite the complaints, the claimant's examination revealed she had vital signs within normal limits, normal HEENT findings, supple neck without adenopathy, thryomegaly, or masses, and no palpable cervical, supraclavicular, epitrochlear, axillary, or inguinal lymph nodes; chest and lungs examination with a few scattered wheezes, but good exchange; regular heart rate and rhythm, with normal S1, S2 sounds, and no extra sounds or murmurs, and no edema (observable swelling from fluid accumulation); soft and nontender and nondistended abdomen with positive bowel sounds, and no hepatosplenomegaly or masses palpated; +4/+4 pulses; excellent performance of the finger-nose test, while actually moving her arms quite easily; fairly well performed heel-to-toe tandem gait, but with claimant refusal to do the alternative leg stand, stating that she could not do it, but when asked to try to do it the claimant actually did it fairly well; toe and heel stand amazingly done fairly well; absent Romberg; no assistive device utilized; hardly any motion at all on all range of motion exams as they were all . . . performed extremely tentatively; negative straight leg raising test in the sitting position; no paravertebral muscle spasms, tenderness, crepitus, effusion, deformities, or trigger points; 5/5 motor strength and normal muscle bulk and tone; normal sensory examinations; and +3/+3 deep tendon reflexes. Dr. Tendall concluded that the claimant does have objective evidence of mild restrictive airway disease.  And although it did appear that she did have some limitations in her back that might be slightly restricting for her, it was difficult to evaluate her true problems with her back because of her exaggerations and lack of effort (Exhibit 1F).

        * * *

> . . . On October 18, 2008, state consultative examiner Dr. Tendall reported that the claimant appeared to be extremely depressed with a frown on her face the whole time and she cried intermittently, and although the claimant walked slowly she actually moved fairly easily.  The claimant was able to get up onto the examination table slowly and she performed her range of motion with great drama and with no energy at all.  Dr. Tendall noted that the claimant performed virtually all of her range of motion activities with extremely poor effort.  However, her spontaneous activities were performed much more easily and much more completely.  The claimant's range of motion were performed extremely tentatively and with hardly any

motion at all.  Dr. Tendall concluded that it was difficult to evaluate the claimant's true problems with her back because of her exaggerations and lack of effort (Exhibit 1F). . . .

* * *

Lending support to the residual functional capacity is a state consultative examination by Dr. Tendall. . . .  Dr. Tendall found that the claimant can stand and walk for two hours in a workday, with her limitation due to limitations in range of motion of her back.  The claimant does not have any limitations in sitting.  The claimant can lift and carry 10 pounds frequently and 20 pounds occasionally with her limitation due to limitations in range of motion of her back.  The claimant is limited in performing any postural activities on a limited basis due to decrease in range of motion of her back.  The claimant does not have any manipulative limitations, nor does she have any relevant visual, communicative, or workplace environmental limitations (Exhibit 1F).

. . .[T]he undersigned assigns some weight to Dr. Tendall's opinion with regard to the claimant's physical limitations, as it is not entirely supported by the medical evidence of record that finds that the claimant was less limited than determined by this doctor.  In addition, much of the opinion is based on the claimant's back condition, but there is little evidentiary evidence of significant lumbar spine impairment to support the limitations imposed by Dr. Tendall.  And the claimant's neck impairment has shown improvement since her surgery in January 2012 and limitations found by Dr. Tendall and not supported by the cervical spine findings.

Plaintiff argues that the ALJ "erroneously evaluated" Dr. Tendall's opinions.  Specifically, plaintiff asserts:

Dr. Tendall opined that, based on limited range of back motion, Steele could stand and walk for two hours in a workday. (Tr. 309).  There are two ways to interpret that opinion: Steele could stand two hours per workday and separately walk two hours per workday; or Steele could stand and/or walk in combination two hours per workday.  The ALJ stated that Dr. Tendall's opinion supported his residual functional capacity assessment. (Tr. 40 ("Lending support")).  That does not make sense.

The ALJ found that Steele could stand and walk each six hours each in an eight-hour workday. (Tr. 32).  An opinion that a claimant can stand two hours per workday or stand and/or walk two hours per workday does not support but instead contracts [sic] a finding that a claimant can stand six hours per workday. . . .

/ / /

/ / /

/ / /

At the outset, the court observes that plaintiff misreads the ALJ's discussion of Dr. Tendall's findings and opinions.  Specifically, while plaintiff states that the ALJ found that "Dr. Tendall's opinion supported his residual function capacity assessment" (emphasis added), the ALJ said no such thing.  Rather, the ALJ stated that Dr. Tendall's examination lent support to the residual functional capacity assessment.  Thus, the ALJ was referring to Dr. Tendall's objective examination findings, which were unremarkable, and not Dr. Tendall's opinions.

With respect to Dr. Tendall's opinions, specifically his opinions regarding limitations on plaintiff's ability to stand/walk, the court notes, as did the ALJ, that Dr. Tendall could not accurately ascertain plaintiff's true limitations due to exaggeration and lack of effort.  Notably, plaintiff fails to address this in her brief.  Given this record, the court cannot say that the ALJ erred in giving Dr. Tendall's opinions only some weight.

2.    Dr. Kinnison

As to Dr. Kinnison, the ALJ stated:

. . .The claimant had a subsequent state consultative examination where the claimant was generally uncooperative and her examination findings unremarkable, despite her complaints of low back pain, as well as asthma and body pain throughout.  On November 4, 2011, Michael G. Kinnison, M.D., reported that the claimant was examined at the request of the California Department of Social Services for an internal medicine evaluation.  The claimant complained of asthma for 20 years and recently diagnosed with chronic obstructive pulmonary disease and emphysema; back pain for 32 years with weakness throughout her body; muscle weakness throughout; constant (24/7) migraine headaches for many years; and arthritis of the knees, fingers, hands, and legs where she generally feels a sharp pain start at the very top of her head and shoots down throughout her body to her feet and now occasional to frequent paralysis with an inability to move.  The claimant's examination revealed she was in no acute distress, ambulated slowly, and she sat comfortably.  The claimant however could barely get on and off the examination table and she refused to move into a supine position and refused most of her range of motion.  Examination also revealed vital signs within normal limits; supple neck without adenopathy, thyromegaly, or masses, and no palpable cervical, supraclavicular, epitrochlear, or axillary lymph nodes; lungs clear to auscultation and percussion with good breath sounds; regular heart rate and rhythm, with normal S1 and S2 sounds and no extra sounds or murmurs heard, and no edema; soft and nontender and nondistended abdomen with positive bowel sounds, and no hepatosplenomegaly or masses palpated; peripheral pulses 2+ and equal bilaterally in carotid,

7

radial, dorsalis pedis, and posterior tibial pulses; good coordination with negative Romberg testing, slow gait, and an occasional limp that protected her left side, but for most of the time does not use an assistive device; refusal to participate in range of motion examination of the neck, Cervical region: but with findings of flex 5 degrees, extend 5 degrees, and lateral flexion is 5 degrees and rotation about 20 degrees bilaterally; lumbar region flex of maybe 10 degrees, and refusal to perform extension and lateral flexion; refusal to do range of motion of the hip joints, knee joints, ankle joints, shoulder joints (some movement), elbow joints, wrist joints, finger/thumb joints; no straight leg raising test performed; apparent intact sensation to touch; 2+ deep tendon reflexes in the bilateral upper and lower extremities; and intact cranial nerves II-XII. The claimant refused to move into a supine position and refused most of her range of motion. Dr. Kinnison concluded that the claimant had a very limited examination secondary to the claimant's stating that she had total body pain and could not do range of motion. In addition, the claimant's grip was 3/5 bilaterally with absolutely no effort, and her upper and lower extremities revealed no effort for strength (Exhibit 10F).

                            * * *

. . .On November 4, 2011, state consultative examiner Dr. Kinnison reported the claimant appeared to be a depressed, very angry and somewhat non-cooperative female who was in no acute distress. She ambulates slowly, but otherwise normally and sits comfortably. She can barely get on and off the examination table. The claimant refused to move into a supine position and refused most of her range of motion. Dr. Kinnison concluded that the claimant had a very limited examination secondary to the claimant's stating that she had total body pain and could not do range of motion. In addition, the claimant's grip was 3/5 bilaterally with absolutely no effort, and her upper and lower extremities also revealed no effort for strength (Exhibit 10F). . . .

                            * * *

. . .[T]he residual functional capacity assessment is based, in large part, on the state consultative examination opinion of Dr. Kinnison. On November 4, 2011, Dr. Kinnison reported it was very difficult to assess the claimant secondary to a very strong psychiatric overlay. Dr. Kinnison found that the claimant can stand and walk up to six hours daily, with no limitation in sitting and no need to use an assistive device; lift 20 pounds occasionally and 10 pounds frequently; occasionally climb at her own rate; occasionally kneel and crawl; frequently stoop and crouch; and is with no restrictions in her balance. Upper extremity limitations were difficult to assess due to poor effort on examination by the claimant (Exhibit 10F).

. . .[T]he undersigned assigns great weight to Dr. Kinnison's opinion, as it is supported by the medical evidence of record that finds that the claimant had physical impairments consistent with the residual functional capacity of unskilled light work. The claimant's examination performed by Dr. Kinnison was unremarkable with no findings that support significant

1   limitations in lifting, sitting, standing, or walking.

2          Plaintiff argues that the ALJ erred in relying on Dr. Kinnison's opinions, noting

3   that the doctor's November 2011 evaluation pre-dated her January 2012 back surgery, and

4   concludes: "The Court should hold that Dr. Kinnison's pre-surgery opinion is not substantial

5   evidence for the ALJ's residual functional capacity assessment."  Plaintiff also argues that the

6   ALJ erred in failing to "obtain the report of a post-surgery consultative examination."

7          The court does not agree.  It is for the agency – not this court – to assess the

8   meaning of a doctor's opinion.  It is for this court to determine whether such assessment was

9   based on substantial evidence and a correct application of the law.  Plaintiff makes no argument

10  in this regard.  Moreover, plaintiff's argument makes no logical sense because, if plaintiff was as

11  capable as opined by Dr. Kinnison based on a pre-surgery examination, it follows that plaintiff

12  would be found to be even more capable post-surgery, especially given plaintiff's statements that

13  the surgery helped.

14          3.    Dr. Smith

15  As to Dr. Smith, the ALJ stated:

16  . . .On March 28, 2012, David Wayne Smith, M.D., Feather River Tribal
    Health, reported that the claimant was "recovering amazingly well since
17  the surgery" (Exhibit 16F/10).  On April 4, 2012, the claimant was seen at
    Feather River Tribal Heal following her back surgery and she was reported
18  to be "doing very well" (Exhibit 22F/18).  On August 22, 2012, the
    claimant was reported to have a stable psychiatric mood.  The claimant
19  reported that she noticed about two months ago that Depakote "helps a
    great deal" (Exhibit 22F/10).  On February 20, 2013, Feather River Tribal
20  Health reported that the extra 30 mg of Cymbalta helped the claimant as
    she was now better on 90 mg and was improving at times (Exhibit 22F/2).
21  On January 10, 2013, the claimant reported that the addition of Lexapro
    assisted her mood (Exhibit 22F/3).
22
                  * * *
23
    On February 20, 2013, Dr. Smith reported in a Medical Source Statement
24  that the claimant. . .has mild limitations in [her] ability to remember
    locations and work-like procedures; understand, remember, and carry out
25  short and simple instructions; maintain attention and concentration for
    extended periods (the approximately 2-hour segments between arrival and
26  first break, lunch, second break, and departure); make simple work-related

9

decisions; complete a normal workday/workweek without. . .interruptions from psychologically based symptoms; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and to respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  The claimant was found to have moderate limitations in activities of daily living, mild limitations in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  On average, it was anticipated that the claimant's impairments or treatment would cause her to be absent from work more than four times per month (Exhibit 23F).

A treating physician's medical opinion, on the issue of the nature and severity of an impairment, is entitled to special significant; and, when supported by objective medical evidence and consistent with otherwise substantial evidence of record, entitled to controlling weight (Social Security Ruling 96-2p).  However, the undersigned . . . finds no support in the findings reported by Dr. Smith.  The report primarily summarizes the claimant's subjective complaints and diagnoses but does not present objective clinical treatment findings that support its conclusions.  In addition, the claimant's ability to perform multiple activities of daily living lends less support to this opinion.  Accordingly, the undersigned gives little evidentiary weight to this opinion which, if otherwise accepted as credible, would indicate that the claimant could not perform any kind of work.

Plaintiff argues that the ALJ erred in rejecting Dr. Smith's opinions that plaintiff is moderately limited in her ability to perform within a schedule, maintain regular attendance, be punctual, sustain a normal routine without special supervision, and work in coordination with or proximity to others without undue distractions.  Specifically, plaintiff contends that the ALJ "either misstated or misunderstood the objective medical evidence" in finding that Dr. Smith's opinions are not supported by the doctor's findings.  Plaintiff also argues that the ALJ erred by citing to "unspecified" daily activities.  Next, plaintiff states that the ALJ rejected Dr. Smith's opinion based on "irrelevant and incoherent rhetoric" that the doctor's opinion, if accepted, would mean that plaintiff could not perform any kind of work.  Finally, plaintiff contends that the ALJ failed to afford Dr. Smith's opinion deference as a treating source and a specialist.

///

///

As stated above, the ALJ is entitled to reject any opinion, even a treating source opinion, that is only minimally supported by objective findings.  Such is the case with Dr. Smith's opinion.  The court does not agree with plaintiff that plaintiff's subjective reports to the doctor of memory deficits, decreased energy, low frustration tolerance, and depressed mood constitute objective findings supporting Dr. Smith's opinions.  Dr. Smith's report references no results of psychological testing or other "observable facts that can be medically described and evaluated."  20 C.F.R. § 404.1528(b).  Given the lack of objective findings cited in Dr. Smith's report, the ALJ did not err in affording the doctor's opinions little weight.

4.   Dr. Keifer

As to Dr. Keifer, the ALJ stated:

A state consultative examiner did not find any significant abnormalities during the claimant's MSE and supported a finding of moderate mental impairment.  Reporting to the California Department of Social Services, John Keifer, Psy.D., provided a psychological consultation on July 19, 2011.  The claimant arrived 20 minutes late for the appointment.  The claimant ambulated freely and she was cooperative throughout the interview.  The claimant filled out the questionnaire completely and she was considered to be an average historian.  The claimant complained of symptoms of depression that she reported started in 1997, with associated difficulty sleeping, feelings of sadness, lack of energy, and no gumption to do anything.  Despite the complaints, the claimant's examination revealed she was oriented to time, place, and person, and she had adequate grooming and appearance; good eye contact; unremarkable posture and ability to ambulate freely; cooperative behavior; logical and goal directed thought processes; normal rate of speech and relevant content, with normal and clear articulation and normal volume; appropriate thought content, with no indication of hallucinations or delusions; described "Blah" mood; affect restricted and congruent with mood; no reported (denied) suicidal or homicidal ideation; intellectual functioning within average range; intact intermediate and remote memory; good fund of knowledge; good calculation skills; concentration within normal limits; good abstract thinking ability; and good insight and judgment.  The claimant was diagnosed with dysthymia (Exhibit 6F).

* * *

. . .Dr. Keifer reported that the claimant has a fair ability to understand, remember, and carry out very short and simple instructions; maintain attention and concentration; and accept instruction from a supervisor and respond appropriately.  The claimant has a poor ability to understand, remember detailed and complex instructions; interact with coworkers;

1   sustain an ordinary routine without special supervision; complete a normal
    workday/workweek without interruption at a consistent pace; and deal
2   with various changes in the work setting.  The likelihood of the claimant
    emotionally deteriorating in the work environment is moderate (Exhibit
3   6F).

4       Little weight is assigned to Dr. Keifer's opinion.  Although the claimant
        can perform simple repetitive tasks as found by Dr. Keifer, the
5       examination findings from [Feather] River Tribal [Health] indicate the
        claimant was doing much better than found by Dr. Keifer in terms of her
6       ability to function and sustain work.  The claimant's ability to perform
        multiple activities of daily living lends less support to this opinion.
7

8           Plaintiff argues that the ALJ failed to provide sufficient reasons for rejecting Dr.

9   Keifer's opinion that plaintiff's ability to interact with co-workers, complete a normal

10  workday/workweek, and deal with changes in the work setting is "poor."  The court does not

11  agree because Dr. Keifer's opinions are inconsistent with the doctor's own objective findings on

12  mental status examination, which were unremarkable.

13      **B.    Credibility Assessment**

14          The Commissioner determines whether a disability applicant is credible, and the

15  court defers to the Commissioner's discretion if the Commissioner used the proper process and

16  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

17  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

18  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

19  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

20  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

21  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

22  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

23  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

24  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

25  / / /

26  / / /

1    If there is objective medical evidence of an underlying impairment, the

2  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

5          The claimant need not produce objective medical evidence of the
        [symptom] itself, or the severity thereof.  Nor must the claimant produce
6        objective medical evidence of the causal relationship between the
        medically determinable impairment and the symptom.  By requiring that
7        the medical impairment "could reasonably be expected to produce" pain or
        another symptom, the Cotton test requires only that the causal relationship
8        be a reasonable inference, not a medically proven phenomenon.

9        80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
        Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

10

11    The Commissioner may, however, consider the nature of the symptoms alleged,

12  including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

13  947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

14  claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

15  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

16  prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

17  physician and third-party testimony about the nature, severity, and effect of symptoms.  See

18  Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

19  claimant cooperated during physical examinations or provided conflicting statements concerning

20  drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

21  claimant testifies as to symptoms greater than would normally be produced by a given

22  impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

23  Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

24  / / /

25  / / /

26  / / /

1    Regarding reliance on a claimant's daily activities to find testimony of disabling

2    pain not credible, the Social Security Act does not require that disability claimants be utterly

3    incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

4    repeatedly held that the   ". . . mere fact that a plaintiff has carried out certain daily activities . . .

5    does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

6    Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

7    Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

8    claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

9    restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

10   claimant was entitled to benefits based on constant leg and back pain despite the claimant's

11   ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

12   activities are not easily transferable to what may be the more grueling environment of the

13   workplace, where it might be impossible to periodically rest or take medication").   Daily

14   activities must be such that they show that the claimant is ". . .able to spend a substantial part of

15   his day engaged in pursuits involving the performance of physical functions that are transferable

16   to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard

17   before relying on daily activities to find a claimant's pain testimony not credible.  See Burch v.

18   Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

19        The ALJ summarized plaintiff's statements as follows:

20   In activities of daily living, the claimant has mild restriction.  The claimant
     reported in her adult function report that she is able to feed herself, care for
21   animals, slowly do some household chores, drive, go shopping, and watch
     television (Exhibit 6E).  In addition, on July 19, 2011, the state
22   consultative examiner reported the claimant is able to shower and change
     clothes every other day, although the claimant reported it is often very
23   stressful on her back to shower.  The claimant can use a microwave for
     cooking, but cannot stand long enough for other cooking.  She said she
24   was also limited from cleaning or shopping due to her limited standing.
     However, she did not allege limitations of her activities of daily living due
25   to mood (Exhibit 6F).  On January 10, 2013, Feather River Tribal Health
     reported that the claimant was occupied with the raising of her
26   grandchildren.  The claimant was reported to have three children in her

house on a full time basis (Exhibit 22F/3).

The above indicates that the claimant's daily activities have been somewhat greater than had been generally reported and that her daily activities had not been significantly impaired to prevent her from functioning in a work environment.

In social functioning, the claimant has mild difficulties.  The claimant reported that she spends time with her grandchildren, spends time with others, and speaks to her brothers and sisters on the telephone twice a week, and she goes grocery shopping, takes the children to school, and attends doctors' appointments (Exhibit 6E).  The claimant testified that she visits with friends when they come over and also talks on the telephone with them, and she went to the movies with her daughter about three weeks ago.  The claimant testified that she sometimes uses a computer to go on Facebook to talk to family, and also plays games usually once or twice a day on the computer.  In a third party statement from the claimant's daughter-in-law, Shelly Solis, it is reported that the daughter-in-law has coffee and visit[s] with the claimant 3-5 days a week (Exhibit 4E/1).  The claimant is able to interact with others while going shopping, attending doctor appointments, or interacting with others.

. . . Furthermore, the claimant reported that she is able to drive, watch television, go shopping, pay bills, count change, handle a savings account and use a check book and money orders (Exhibit 6E).  The claimant testified that she continues to care for her grandchildren and is paid for the childcare.  This work requires significant caring skills and functional abilities relative to concentration, persistence, or pace.  In addition, the undersigned notes that the claimant went into great detail in providing responses to her disability report and in answering her adult function report (Exhibits 3E and 6E).  As noted above, the claimant testified that she sometimes uses a computer to go on Facebook to talk to family, and also plays games usually once or twice a day on the computer.  This is indicative of an ability to maintain an acceptable level of concentration to perform at least simple tasks.

In addition, the claimant had no difficulties in answering and understanding the questions posed to her at the hearing, which is also indicative of an ability to follow instructions and maintain an acceptable level of concentration to perform at least simple tasks.

* * *

The claimant claims her ability to work is limited by nerve damage in both arms, chronic obstructive pulmonary disease (COPD), depression, migraine headaches, asthma, and spine damage (Exhibit 3E/2).  At the hearing, the claimant testified that she last worked in December 2010 performing childcare.  She stated that she cared for her grandchildren and was paid for it.  The claimant stated that she stopped performing childcare duties because she had difficulty lifting things due to her back pain and she was afraid the children would need something and she could not help

them.  The claimant said that she is unable to work because she cannot concentrate and has trouble motivating herself or focusing on anything. She agreed that she has anxiety and depression everyday and especially at the end of the day when her daughter comes home and the children are screaming.  The claimant said that every day she has neck problems and the nerves in her arms give out and she cannot lift.  The claimant said she had back pain and migraine headaches every day.  The claimant [stated] that resting makes her pain a little better, but she cannot stay in one position very long.  The claimant testified she sees a psychiatrist once a month.  The claimant said she can stand for 10 minutes, walk one-quarter of a block before having to stop, sit 20 minutes or a little longer if she sits on a comfortable chair, and can lift under five pounds like a loaf of bread. The claimant stated that she has difficulty with breathing and feels fatigue quite often, stating she had an asthma attack yesterday and was fatigue[d] after the attack.  She said that in a typical [day] she makes herself a cup of coffee, tries to wash dishes, finds things around the house that she can do (uses a grabber to pick up things off the floor), cares for her dog with help from her daughters, uses a microwave for meals, do light loads of laundry, and can take a bath but needs help getting out sometimes from the tub. She said that she does not go shopping.  She said she walks around the yard and no further because her back can go out.  She visits with friends when they come over and also talks on the telephone with them.  The claimant stated that she went to the movies with her daughter about three weeks ago.  The claimant said she sometimes uses a computer to go on Facebook to talk to family, and also plays games usually once or twice a day on the computer.  She said that she stays on the computer for maybe one hour at a time, but this causes her back pain.  The claimant testified that she has adverse side effects from her medications that include dry mouth, dizziness when she stands, and itching.  The claimant recalled that she had lower back surgery on "January 12, 2012" and in response to a question whether it helped, the claimant stated that the surgery helped a little and her back still hurts.

Regarding credibility, the ALJ stated:

. . .[T]he claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained throughout this decision.

In terms of the claimant's alleged inability to do work due to degenerative disc disease of the lumbar spine; symptoms of status post discectomy; degenerative disc disease of the cervical spine; asthma; chronic obstructive pulmonary disease; dysthymia; and headaches, the medical record does not support the claimant's alleged severity of her symptoms and limitations.

The ALJ then summarized Dr. Tendall's objective findings (discussed above) and continued:

The record supports a less than light work limitations as findings during the period of adjudication were generally unremarkable with findings . . . that consistently showed the claimant had a steady gait and normal motor

16

strength and neurological findings. On January 7, 2011, the claimant's examinations showed the claimant was in no acute distress and oriented; she had vital signs within normal limits; intact HEENT findings except a lift-side facial droop since benign tumor removal; 5/5 motor strength in the upper and lower extremities, except the triceps and left hand fingers; steady gait; difficulty with tandem walking because of leg pain; reported diminished sensation to light touch in the left arm, right forearm down to her fingers and right leg into all toes; and 2+ deep tendon reflexes (Exhibit 4F/17). Examination on February 11, 2011, revealed the claimant was in no acute distress and oriented to time, place, and person, and had intact cranial nerves; intact motor findings with no pronator drift and 4/5 strength in the upper and lower extremities; equal and symmetrical deep tendon reflexes; normal finger coordination; normal rapid alternating movements; normal gait; sensation decreased to light touch in the right lower extremities; 5/5 motor strength in the upper and lower extremities in all muscle groups; intact sensation; intact cerebellar; steady gait; 2+ and symmetrical deep tendon reflexes in the upper and lower extremities; and negative Hoffman's test (Exhibit 15F/82 and 84).

The claimant's examination findings did not support a disabling COPD or asthma impairment. On January 25, 2012, records from Feather River Tribal Health indicate the claimant was oriented to time, place, and person, and she had vital signs within normal limits; moist rhonchi, but no wheezing; and regular heart rate and rhythm, with no murmurs, or rubs, and normal S1 and S2 sounds. The remainder of the exam was otherwise unremarkable, with some complaints of left lower extremity edema (Exhibit 14F/10). On February 9, 2012, UCSD Medical Center records indicate that review of symptoms was negative for myalgias and arthralgias, as well as negative for dizziness, tingling, tremors, and headaches. In addition, examination showed a supple neck with normal range of motion; no musculoskeletal range of motion with no edema and no tenderness; regular heart rate and rhythm, with normal heart sounds and intact distal pulses, with no gallops; and normal pulmonary exam with normal effort and normal breath sounds, with no respiratory distress, wheezes, or rales (Exhibit 15F/19-20). On February 14, 2012, the claimant's examination revealed she had vital signs within normal limits and she had lungs clear to auscultation bilaterally; and no wheezes, rales, or rhonchi. The remainder of the exam was otherwise unremarkable (Exhibit 15F/10). On March 13, 2012, the claimant's exam at UCSD Medical Center showed she had mild wheezing (Exhibit 15F/6).

The ALJ then summarized additional treating records from April 2012 through September 2012 showing unremarkable objective findings. The ALJ also summarized Dr. Kinnison's findings (discussed above), and continued as follows:

Diagnostic findings following the claimant's cervical spine surgery were unremarkable and did not show any significant orthopedic condition to support the claimant's claim of disabling symptoms and did not show

17

evidence of nerve root or spinal cord compromise or compression.  On March 22, 2011, the claimant underwent a magnetic resonance imaging (MRI) of the cervical spine that demonstrated multilevel degenerative changes within the lower cervical spine most prominent at the C5-6 level causing moderate bilateral neuroforamina narrowing at that level (Exhibit 4F/19).  On November 3, 2011, the claimant was status post L5-S1 fusion and underwent a CT scan of the cervical spine.  The study revealed expected surgical changes with no acute complications identified (Exhibit 15F/108).

Diagnostic studies relative to the claimant's respiratory impairment were also unremarkable and do not support a disabling impairment.  On January 31, 2011, the claimant's lung x-rays revealed a stable 3.8 cm thin-walled cavity or bulla, with no new focal infiltrates (Exhibit 7F/14).  The claimant underwent chest x-rays on February 11, 2011, that showed normal heart, mediastinum, and diaphragm, with a 4cm cystic structure in the right middle lobe, but the lungs clear to auscultation bilaterally were otherwise clear (Exhibit 4F/21).  Chest x-rays completed on January 6, 2012, showed no acute disease and no significant change comparison to the prior exam.  There was diffuse bilateral interstitial prominence similar to the prior examination and no change in the 4 cm cystic structure (Exhibit 15F/112).  The claimant's lung x-rays completed on January 14, 2012, demonstrated improved lung volume when compared to yesterday.  Multifocal areas of presumed pneumonia seen on yesterday's CT study were not clearly seen (Exhibit 15F/99).  The claimant's chest x-rays done on February 9, 2012, were also unremarkable with findings of improving multifocal pneumonia (Exhibit 15F/97).

The ALJ then summarized mental status examination findings from Feather River Tribal Health from June 2011 through February 2013, which were unremarkable.  The ALJ also summarized Dr. Keifer's findings (discussed above) and stated:

In evaluating the claimant's subjective complaints of pain and symptoms and alleged mental impairment. . ., the undersigned notes that the claimant's treatment prior to and after her cervical spine surgery has been conservative in nature and not the type one would expect from a disabling condition; the record does not contain evidence that the claimant's medications caused adverse side effects that would preclude sustained work activity; the record does not provide abnormal findings on examination and diagnostic work up to support her alleged disabling condition; the record contains evidence of multiple MSE's that revealed few abnormal findings and little evidence of cognitive impairment; the record contains no records of regular psychiatric treatment; and the claimant has not had any psychiatric hospitalizations.

Moreover, in evaluating the claimant's subjective complaints of pain, the undersigned notes that the claimant describes an active life that includes an ability to feed herself, care for animals, slowly do some household chores, drive, go shopping, watch television, take the children to school,

18

and attend doctors' appointments (Exhibit 6E).  The claimant testified that she sometimes uses a computer to go on Facebook to talk to family, and also plays games usually once or twice a day on the computer.  The evidence is inconsistent with limitations that would preclude sustained work activity, and is consistent with an ability to do less than a wide range of light work activity.

Other considerations in evaluating the claimant's credibility include the fact that the record reflects clinical findings that revealed that the claimant's treatment was effective in stabilizing her physical/mental symptoms.  The claimant reported on August 17, 2011, that Cymbalta was helping with a calming effect.  She also reported that Depakote was improving her headaches (Exhibit 22F/28).  On September 15, 2011, Dr. Smith reported that the claimant was "now in complete remission from the depression" (Exhibit 22F/27).  On January 26, 2012, David Wayne Smith, M.D., Feather River Tribal Health, reported that the claimant was contacted and she reported that she was "recovering well from surgery and mental status is holding up" (Exhibit 16F/8).

Next, the ALJ summarized additional treating records from Feather River Tribal Health from March 2012 through January 2013 indicating that plaintiff was improving with treatment.  The ALJ then discussed evidence showing exaggeration of symptoms:

In evaluating the claimant's subjective complaints of pain. . ., the undersigned notes that various examining physicians were unable to obtain accurate information from the claimant due to her symptoms or felt that the claimant exaggerated her symptoms. . . .

The ALJ noted additional findings and observations from Drs. Tendall and Kinnison (discussed above).  The ALJ then stated:

When comparing the results of the claimant's conduct during examinations with the consultative examiners and the results of treatment at Feather River Tribal Health, it is clear the claimant's condition is not as severe as she alleges and she is more functional despite her complaints.  In addition, though she stated she lies down most of the day and her children help her with chores, other statement[s] show that the claimant is raising her grandchildren while her children have other difficulties preventing them from helping (Exhibit 24F).  She also stated she goes to movies, she plays games, or goes on Facebook with her family once or twice per day for an hour each time.

The claimant's alleged disabling symptoms were often absent and contradict the claimant's claim of continuing disability due to her alleged impairments.  On January 25, 2012, records from Feather River Tribal Health indicate that the claimant has a history of chronic obstructive

1   pulmonary disease (COPD) and asthma, but had not been bothered by
    difficulty breathing (Exhibit 14F/10).

2

3   Next, the ALJ noted evidence that plaintiff repeatedly failed to follow doctor recommendations

4   to quit smoking.  The ALJ noted: "The fact that the claimant continued to smoke despite having

5   COPD/asthma and a medical recommendation that she cease smoking suggests that the

6   symptoms may not have been as serious as has been alleged in connection with this application

7   and appeal."  Finally, the ALJ stated:

8           The claimant's description of the severity of the pain has been so extreme
            as to appear implausible, especially in light of the lack of objective
9           physical findings.  The claimant reported in her adult function report that
            her conditions affected lifting, squatting, bending, standing, reaching,
10          walking, sitting, kneeling, talking, hearing, climbing, seeing, memory,
            completing tasks, concentration, understanding, using her hands, and
11          getting along with others (Exhibit 6E/6).  Despite the multiple complaints,
            the records showed that the claimant's complaints were unsupported by
12          the record and did not support significant impediments in the claimant's
            functional abilities.

13

14          Despite the ALJ's extremely thorough discussion, plaintiff argues that the ALJ

15  failed to provide clear and convincing reasons for rejecting her statements as not credible.

16  Specifically, plaintiff contends that the ALJ erred in evaluating the medical opinions, erred in

17  citing her daily activities, erred in citing continued smoking, and erred with respect to

18  improvement with treatment.

19          Plaintiff's arguments are unpersuasive.  In particular, the ALJ noted throughout

20  the hearing decision instances where plaintiff was thought by medical professionals to be

21  exaggerating her symptoms.  Notably, plaintiff fails to address this issue in her brief other than

22  saying "[t]he ALJ did not mention malingering," which is incorrect.  Malingering – or symptom

23  exaggeration – was mentioned numerous times by the ALJ in summarizing the medical evidence.

24  For this reason alone, the ALJ was entitled to discount the credibility of plaintiff's statements.

25  / / /

26  / / /

1    **C.      Past Relevant Work**

2          A social security claimant is not disabled if she can perform her past relevant

3    work, either as actually performed or as generally performed in the national economy.  See 20

4    C.F.R. § 404.1560(b).  As to past relevant work, the ALJ found that plaintiff is capable of

5    performing her past relevant work as a "cashier II."  Specifically, the ALJ stated:

6          The job was performed by the claimant within the previous 15 years and
           was of the requisite time length necessary to learn the demands of the job.
7          The vocational expert, Thomas Sartoris, assessed the claimant's past
           relevant work as follows: cashier II which is defined as light exertion,
8          unskilled work at SVP 2 (DOT No. 211.462-010)(light/svp-2).

9          The undersigned asked the vocational expert whether the claimant is able
           to perform the job requirements of her past relevant work with the residual
10         functional capacity.  In comparing the mental and physical demands of the
           claimant's past relevant work with the claimant's residual functional
11         capacity, Mr. Sartoris testified that the claimant was able to perform past
           relevant work as a cashier II as actually and generally performed.

12
           The court concurs with and adopts the analysis of the vocational expert
13         and so finds.

14         Plaintiff argues that substantial evidence does not support the ALJ's finding that

15   she can perform her past relevant work, either as actually performed or generally performed.

16   Because defendant concedes that the ALJ erred in concluding that plaintiff can perform her past

17   relevant work as actually performed, the court will focus on whether substantial evidence

18   supports the alternative finding that plaintiff can perform her past relevant work as generally

19   performed.

20         In this regard, plaintiff argues that her past relevant work was a "composite job"

21   because she supervised other people while working as a cashier.  As defendant notes, however,

22   the issue was put to the vocational expert at the administrative hearing and the expert did not

23   opine that plaintiff's past relevant work was a composite job.  Instead, the expert identified the

24   job as "cashier II."  Moreover, plaintiff was represented by counsel at the administrative hearing

25   and failed to cross-examine the vocational expert on this issue.  Therefore, this issue is waived.

26   See Meanel v. Apfel, 172 F.3d 1111 (9th Cir. 1999).

21

1    Plaintiff also argues that, despite the vocational expert's testimony that her past

2 relevant work was "cashier II," she actually worked as a change person, which is a position with

3 higher exertional requirement (light for cashier; medium for change person).  As above, the

4 vocational expert testified otherwise, and the issue is waived because plaintiff's counsel failed to

5 raise it at the hearing.

6    **D.    Conflict with DOT**

7    Plaintiff contends that the ALJ failed to inquire about a conflict between the

8 reasoning level required for the job cashier II identified by the vocational expert and the

9 definitions in the Dictionary of Occupational Titles ("DOT").  According to plaintiff, the job of

10 cashier II requires a reasoning level of 3 (ability to apply commonsense understanding to carry

11 out instructions furnished in written, oral, or diagrammatic form, and deal with problems

12 involving several concrete variables in or from standardized situations), but her limitation to

13 simple repetitive tasks indicates a reasoning level of 2 (ability to apply commonsense

14 understanding to carry out detailed but uninvolved written or oral instructions, and deal with

15 problems involving a few concrete variables in or from standardized situations).

16    In this case, the ALJ limited plaintiff to simple repetitive tasks, indicating a DOT

17 reasoning level of 2 or possibly 1 (ability to apply commonsense understanding to carry out

18 simple one- or two-step instructions, and deal with standardized situations with occasional or no

19 variables in or from these situations encountered on the job).  A review of the record and, in

20 particular, the transcript of the administrative hearing, reflects no discussion of the apparent

21 conflict between plaintiff's limitation to simple repetitive tasks and the reasoning level required

22 for the cashier II job identified by the vocational expert.  Defendant does not address the issue.

23 Given the apparent conflict and the lack of any analysis by the ALJ, the matter must be remanded

24 for further proceedings on this issue only.  See Zavalin v. Colvin, 778 F.3d 842 (9th Cir. 2015);

25 see also Social Security Ruling 11-4p.

26 / / /

### IV.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the apparent conflict between the vocational expert's testimony and the DOT with respect to reasoning level.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 13) is granted;

2.      Defendant's cross motion for summary judgment (Doc. 17) is denied;

3.      This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.


DATED:  September 30, 2016

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

23